Ms. Bennett, good morning. May it please the Court, Jennifer Bennett on behalf of the appellants. I'm going to try to reserve five minutes of my time for rebuttal if that's all right. Congress enacted the TVPA for the express purpose of ensuring that the law prohibits not only labor that is literally involuntary, but also labor that while technically voluntary is coerced. As the Third Circuit recently explained in Burrell, this purpose is reflected in Section 1589's text, which doesn't use the words voluntary or involuntary, but instead identifies specific means of coercion that are prohibited. And as the Third Circuit explained, these specific means are broadly defined in the statute, and I think it's worth taking a quick look at those definitions. As relevant here, one of those means is abuse of law, and that's defined as using or threatening to use the law for purposes it wasn't designed to exert pressure. Threats of serious harm, which again, broadly defined, threats that, rather harm that is sufficiently serious to compel a reasonable person under the circumstances to perform labor in order to avoid that harm. And similarly, a scheme intended to cause someone to believe they'll suffer serious harm. We're here on the complaint. Correct. And maybe you could elaborate for us how your complaint really substantiates these threats that you allege. And you might also indicate how the second amended complaint somehow improves your picture with respect to those. I've gone through both, and I'm having a hard time. Sure. So I'll start with the people on parole or probation. And with the complaint, the operative complaint, the one the district court looked at here, what the complaint alleges is that the Salvation Army holds the program out as a no-cost rehabilitation program. That's at page 2 of the appendix. It then says that it encourages parole and probation departments to refer people to this program at pages 2 and 3. But what it doesn't advertise, the complaint says, is that, in fact, the Salvation Army uses these people as an unpaid workforce. And it describes this work. What it says is it subjects them to grueling, dirty, often dangerous conditions at a pay of sometimes a dollar a week. Is part of your case, then, that the participants do not go into these programs with a knowing and intelligent, able to make a knowing and intelligent assessment of the program? So I think that is certainly a fair inference from the complaint, especially for the people on parole or probation. But I don't think that's necessary. There are a number of cases in which a bait and switch, I think, is what you're getting at. It is not necessary. And I think if you look at, for example, the Supreme Court's decision in Reynolds, which is the 13th Amendment itself, that is a very similar scheme to what's happening here. In Reynolds, what you had is people who had been convicted of crimes, sentenced to prison, and they had criminal fines. And instead of paying those criminal fines or instead of being incarcerated or working hard labor for the state, they entered into a contract with a private party who would pay off those fines. And they'd work for that private party. And what the court said is, even though that's a voluntary arrangement, it was knowingly, voluntarily entered, there was no bait and switch in that arrangement. What the court said is that's involuntary servitude under the 13th Amendment. For a private party to use threats of incarceration to back up a private work arrangement, even when someone's been convicted, that is involuntary servitude. And that's under the 13th Amendment, not even the TVPA, which everybody, I think, agrees is broader than that. And the principle is the same here. As the Third Circuit recently recognized in Burrell, which was a very similar scheme to what's happening here, a choice. You can stay incarcerated or you can do this work release program, which is conditioned on a period of work of very low pay. And I'll note the pay in that case was actually higher than it is here. What the Third Circuit held is, look, the TVPA doesn't have the words voluntary or involuntary. What it says is if you abuse the law or threaten to abuse the law in order to get someone to pressure you, someone to work for you, that's a violation of the statute. And that's exactly what's happening here. Precisely, how does the present complaint, First Amendment complaint, in your view, convey that sense of pressure?  Sure. So the allegations in the complaint are that if the workers don't work or don't work fast enough or don't work to the Salvation Army's standard, that the Salvation Army will report a violation of their parole or probation, that they'll call their parole or probation officer to report misbehavior, that they'll call the police and it threatens incarceration. And I'll give you the citations for these allegations. Sure. But all of those are simply checks which any rehabilitation organization is going to have in order to keep people on the straight and narrow and to make sure that they fulfill the objectives of the program. Where is the pressure? So the pressure is in using the fact that these people are incarcerated or were incarcerated and sentenced to supervised release or probation and using that to get an unpaid workforce. And that is the abuse. That's the pressure. It's the abuse of the law. The Salvation Army doesn't dispute that the parole and the probation systems are not intended to get a private party unpaid labor. There's no dispute that it's not part of their parole or probation conditions to have to work or to have to work for the Salvation Army. And so the Salvation Army is using the fact that people are on parole or probation. They're abusing that fact in order to generate this workforce. One of the comments that the district court made, if I recall correctly, was I think it applies most especially to the walk-in plaintiffs. They could just leave. They could just walk out the door. If they really are under threat or force or facing serious harm, just get up and leave. There are two responses to that. The first is the Salvation Army creates circumstances in which that makes it more difficult. So, for example, when you arrive at the Salvation Army as a walk-in plaintiff, the organization—and this is at the appendix, page 20, paragraph 136— the organization makes you forfeit your personal property. That includes clothing and includes some medications. And so you're worse off when you get there. It seems implausible to me. If I was a walk-in plaintiff and a member of the adult rehabilitation program at the Salvation Army, and I thought I was under threat or force or experiencing serious harm, that I wouldn't just say, I'm getting out of here. And I could care less about my cell phone or I could care less about my duffel bag. I'm leaving. I'll worry about that later. So, first of all, we're talking about people who the complaint alleges were specifically targeted because they're unhoused. They don't have money. They're in poverty. And so if what happens is you went into the Salvation Army and they took your jacket and your sleeping bag and your prescribed medications, you actually can't leave in Chicago in the wintertime. That does actually create circumstances that make it harder to leave. But I also want to push back on the premise of what—the assumption there of what the TVPA is prohibiting. The TVPA defines threat of serious harm as any threat of harm, physical or non-physical, psychological, financial, or reputational harm that is sufficiently serious under all the circumstances to compel a reasonable person of the same background, the same circumstances, to continue performing labor or services in order to avoid incurring that harm. I don't think there's any dispute. So what the Salvation Army is doing is they're threatening. They're saying if you don't work, the threat that they're making is, the serious harm is, you'll starve and you'll be homeless. There's no dispute about that. One of the points that I would have expected, and maybe it's in keeping with Judge Ripple's question, is that when you read the first or the proposed complaint, that you would come—the complaints are long and have quite a bit in them. You would expect to come to multiple paragraphs where there are some particulars given with respect to threats in force. Now, I observe that. I know it's 8A pleading. It's notice pleading. It's not 9B pleading or anything like that. But you would expect to come to paragraphs that would say, for example, X or for example, Y. It's pretty thin. Your Honor, I think that all that's been— I mean the statement that there's threats, there's force, there's risk of serious harm, that's made over and over again. But where are the factual allegations that create a plausible inference that those elements are satisfied? Sure. So there are a few. So one, the complaint specifically alleges that they're threatened, they're forced to work extra hours if they don't work fast enough. What paragraph do you have in mind? So this is Appendix 19, Paragraph 128. That describes the labor they're performing. Appendix 20 at 139 describes that they threaten to strip the workforce of the food and housing they have provided if they don't perform labor. So what the allegations are there is the Salvation Army is specifically targeting people who are unhoused, who don't have food. They're targeting those people. They're bringing them in. They're saying, we will provide housing and food, but you have to work for no money in this demanding jobs. And then if they don't work fast enough, if they don't work hard enough, they're threatening to take that food and housing away. It's also, to continue answering your question about where they are, Appendix 23, Paragraphs 158 and 159, they also, people there are witnessing people being threatened with incarceration, with calling the police. And so even if that threat's not directed at you, you see people, you don't know the difference between you and whoever's being threatened. And so you see people being threatened. If you don't work hard enough, if you don't work fast enough, we'll call the police. And similarly, on page 39, Paragraph 281, again, it says that the people were threatened with incarceration. And so there's repeated allegations in the complaint that people are, specific allegations in the complaint that Salvation Army employees are threatening to withdraw food and shelter, threatening to call the police, threatening people with incarceration. If they don't work, they don't work hard enough, they don't work fast enough. And I don't think there's any dispute that that is a serious harm. I also want to note that, you know, the Supreme Court in Kosminski, the Third Circuit in Burrell, what they pointed out is that also the work conditions, those are evidence of coercion. And that's because you wouldn't think that an ordinary person would take a job for a dollar a week where they are doing demanding labor in a warehouse. The only reason somebody takes that job is if they're coerced to do so. And I think it's helpful to just— See, when you make arguments like that, what runs through my mind is that the allegations very much have flavors of a minimum law or minimum wage law violations. I don't know if the minimum wage laws apply or not. My sense is probably not, but you can tell me different. And it also kind of sounds in fair labor standards. But it just seems that you've got to then take the next step and get it and fit it within this statute, the human trafficking statute. Sure. So two answers to that. I do think it would be a minimum wage violation. You know, there's no question that they're providing labor services. And are there lawsuits like that out there where members of the program—  They may know better, and it may be an unfair question to you, but the program has been around a while, right? I believe that's right. I don't know if it's changed. But I want to answer the second part of your question, which is why is this not just a minimum wage lawsuit, assuming it is. And there's two things. One, I want to point out that the TVPA does not—it uses the word trafficking, but it gives specific definitions of prohibited means of coercion. And those definitions are broad. It's not meant to just cover what we traditionally think of as, for example, sex trafficking. Congress specifically implemented definitions, and those definitions include a scheme to cause someone to believe that if they don't perform the work, harm will come to them. And harm—withdrawing food and housing is certainly harm. I also want to just go through, if you'll permit me, the circumstances that really differentiate this from just an ordinary bad work environment or minimum wage claim. And it's not a claim just that they're not being paid enough money. What the claim says is they intentionally targeted unhoused, vulnerable people who desperately need food and shelter. Most jobs don't do that. Then it says when they arrived at the Salvation Army, the organization takes away their belongings, their clothing, their prescribed medication, their cell phones. You're referring to the first amended complaint? This is the first amended complaint. That allegation is at appendix 20, paragraph 136. And it uses the word forfeited. They don't get them back. And so the connection between that and the failure to pay means taking all your things, the things you need to survive on the street, and then we're not paying you. So you can't afford to get them back to leave. Then it says—and this is the appendix, page 5, paragraph 18—it then says it isolates workers by imposing a blackout period of at least 30 days, meaning that you can't call your friends, your family, your doctor. You can't try to look around for employment because you can't talk to anyone. And then it says even after the blackout period, they don't let you look for other work, and they don't let you take another job in your spare time. The only reason to do that is to ensure that you don't have enough money to leave. An ordinary program would allow you to do that if the point is to get people back on their feet. You would want people to take other employment, to be able to make a living elsewhere, and they prohibit you from doing that. Suppose you had, hypothetically, suppose you had a group of prisoners that were serving sentences that brought a claim under this statute on the basis that they were forced daily, after passing a physical exam, to work on a highway trash pickup crew. And they said, we're doing that in terribly cold weather. This is nothing we signed up for with our sentence. Doing it in terribly hot weather, we're not getting enough water, etc. Would they state a claim? I think it would depend on the circumstances, but to the extent that the circumstances are that you are using threats of serious harm to coerce someone to labor, potentially, yes. Yeah, you'd say the correctional officers are standing there with guns and telling them to get on the bus. We're going out to the highway to pick up the trash. I see. So the 13th Amendment does have an exception for labor that is imposed as punishment for a crime. So if what you're saying is that the state is imposing this as punishment for a crime, that's exempted from the 13th Amendment. And courts have held that in that narrow circumstance, we assume that the TVPA, which is broader than the 13th Amendment, but is meant to broadly implement the protections against forced labor, that it would have a similar exception. Which is to say, if the state is imposing a punishment for a crime, it's not really labor or services. I get it as far as you saying, well, it wouldn't violate the 13th Amendment, but why wouldn't it violate the statute? I think it potentially, by the literal terms of the statute, might. But because the statute implements the 13th Amendment, what courts have said is in that narrow circumstance, because Congress wouldn't have authority under the 13th Amendment to pass a statute, we're going to assume that in that narrow circumstance where the state is imposing punishment, that in that circumstance, the TVPA doesn't apply. That's not what's happening here. And the United States Supreme Court in Reynolds, which was, again, a 13th Amendment case, very clearly said there's a difference between the state punishing a person, that's permitted, and the state essentially lending out its incarceration authority and a private party taking that incarceration authority in order to coerce someone to continue performing labor for that private party. And unless there are further questions, I'd like to reserve the remainder of my time. I didn't mean to interrupt you. No, that's fine. Okay. You deserve your time. Thank you very much. You're welcome. Mr. Wolfe, good morning. Good morning. Good morning. May it please the Court. My name is Dan Wolfe, and I'm here today to represent the Salvation Army. The Salvation Army has had a presence in this country for over 100 years. It's part of the Universal Christian Church, and as part of its religious mission, it operates the adult rehabilitation centers that are the subject of this lawsuit. And the folks that it typically deals with are folks that are having challenges in life, emotional challenges, maybe domestic abuse, maybe addiction, maybe homelessness. The rehab centers exist to help their rehabilitation. The rehabilitation centers are certainly not for everyone. And they are not, and importantly, they are not no-strings-attached programs. Everyone, and the complaint makes this clear, everyone, whether it's walk-in or justice-referred, are made aware no later than the intake process of a number of requirements at which eligibility and admission is determined. That includes, among many other things, because there's lots of requirements. You can't drink or do drugs. You have to go to church. And you have to perform at least 40 hours, or you have to perform 40 hours of work therapy per week. That's programmatic. And each one of the participants and every one of the plaintiffs understands this, acknowledges this, and says, yes, I understand, sign me up. And that's why we think that this ends the case. Of course, without discovery, we don't know an awful lot about that whole intake process, do we? Well, Judge Ripple, you're right that we don't know everything. But we know from the four corners of the complaint, because they state it at least half a dozen times, if not more, that the work therapy component is a condition and is made known to each applicant, each potential prospective participant. Work therapy is a component. I mean, the complaint paints that picture over and over. If you're going without a meal, without an evening meal for a week, nobody tells you about that, do they? And apparently that would be an allegation of the Third Amendment complaint if it were allowed to be filed, right? I'm sorry. I don't think I heard the first part of that question. That you would go without a meal, an evening meal, for a whole week. Nobody tells you about that. That would not be part of the program. Correct. So you would look at that as a one-off abuse or fault? Well, what I would— If it were alleged. Even giving credit to that sort of allegation, it's not a forced-at-labor allegation, right? And that's that. So there's a lot in the complaint. And, Judge Scudder, I think you touched on some of it. But there's a lot in the complaint that talks about other things that reasonable people may not like. Going without a meal. Going without seven meals. Not getting paid. Having to unload a truck. None of that is about forced labor, though. That may be about wages. That may be about not getting your meal. I think your colleague would say it all goes to atmosphere and whether the atmosphere is coercive or not. Well, to that point, Judge Ripple, and I want to come back to a question that you raised. Or that you posed, my friend. It can't possibly—and ultimately this comes down to what does the trafficking statute apply to? It can't possibly be a fair construction of the federal trafficking statute that a program like the Salvation Army that has known rules and requirements cannot warn or remind its participants that if you don't comply with the requirements of the program, you're not entitled to the benefits of the program. Because that's not how this works. This is not open to everyone. Yeah, the worry that I have with that argument, you can respond to it, is the scope of it. The breadth of it. You can't be saying, can you, that anything goes within the program. So suppose, for example—there's no such allegation. I'm aware of that. But suppose, for example, that there was an allegation that members of the Christian faith, Christian believers, were given favorable treatment vis-a-vis non-Christian program participants. Okay? Allowed? Is that problematic? So that may be problematic, and I appreciate his hypothetical. That may be problematic, and if I may, Your Honor, if I could go back to the heart of your question. We absolutely agree that churches or other organizations, rehabilitation programs, are not exempt from the scope of the law. But what we have here—and this is super important to our position—what we have here is not anything peculiar to these plaintiffs. What we have here is an indictment of the rehabilitation centers themselves, i.e., the operation of the Salvation Army. I wonder, are you taking us broader than we need to be? You know, we know factual allegations in the complaint don't need to prove a claim. And you seem to be at war with the proof of the claim. And we've said that plausible doesn't mean probable. A complaint should survive the motion-to-dismiss stage even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely. That's not the terribly high bar that you are painting this morning, it seems to me. I completely agree, and we're not asking this Court to apply a different standard than the Rule 12b-6 standard. But I do think that Judge Scudder's question really goes to the distinction between what you're describing as outside the scope of Rule 12b-6 and what's properly decided at 12b-6. I think my colleague has touched on the 500-pound gorilla in this case. We are seeing more and more cases decided on the pleadings and with no discovery. And it's beginning to look like if trial by summary judgment was bad, we're now being pushed to approve trial by pleadings. Now, in your case here, on page 47 of your brief, you criticize the plaintiffs because they didn't identify individuals, the times and places where particular things happened. Frank, I wrote in the margin of your brief, it sounds like Rule 9. You seem to be pushing, and certainly the district judge seemed to be pushing, pushing this case into a Rule 9 fraud posture, where we need specificity of pleading. Your whole case seems to be specificity of pleading is necessary. If not, the case is over. With respect, Your Honor, that is not our whole case. I do appreciate your comment, and I will acknowledge that to the extent we are pushing 12b-6 and the capacity of the federal courts to rule on the sufficiency of the complaint, then to the extent that we've gone over the line, that's not a reason for you to affirm below. But I think there are, alternatively, plenty of reasons to affirm below. Really, I would direct your attention to our arguments around page 38-43 of our brief, because that really is, I think, the safe spot in the problem that we have with this. They are taking, just to go back to where I was earlier, they are taking aims squarely at the rehabilitation centers as administered for decades by the Salvation Army. There's nothing special here. There's nothing like, for example, to go back to your example, Judge Scudder, in the Bistline case out of the Tenth Circuit that dealt with fundamentalist LDS, and you had horrific allegations of child abuse and child rape, or even the Burrell decision that my friend referenced, where you had not simply a program there, the state had a work release program, but the local, the jail, the local political unit imposed its own sort of bridge between incarceration and work therapy, where they had to work a period before they could get to the actual state-sanctioned work release program, and that included working below minimum wage at the recycling facility, et cetera. That wasn't something that the law was originally intended to do in that particular circumstance, so the allegation was, wait a minute, they're adding things here that look like forced labor. That's not within the four corners of this complaint. This complaint says only this work therapy program that we all acknowledge is an absolute requirement and program element of the rehabilitation centers was made known, but it turns out we don't like it, and that really goes to, you know, it's sort of like a buyer's remorse. For example, take a monk who's making wine and beer pursuant to a vow of poverty at a monastery. He can't be heard to complain that he's not getting paid for making the wine and the beer, because that's a condition of serving as a monk within a monastery pursuant to the long-held tradition of your vow of poverty, and that's exactly what's happening here. We don't have allegations in the First Amendment complaint or the Second Amendment complaint that take this outside the scope of what the Salvation Army does every day to every single program beneficiary who walks through those doors and agrees to all the things that come with the program, including the work therapy. We do have some troubling allegations, for example, about the government benefits. You know, the government benefits are signed over, understood, when someone joins the program, but if they do leave, as you suggest, that they need to up and go if they don't like it, their government benefits for that month are gone, according to the allegations. They won't get those back. They'll have to wait until the next month for their government benefits to come. So someone who leaves at the beginning of the month because they don't like what they see, what are they to do for the remainder of the month? It's an allegation. That's what it is. Yes, and I have a few points to respond to that, Your Honor. First, I think that mostly comes from the proposed Second Amendment complaint, and I know that we've been discussing that here, but I just want to— Which I would like to ask you about. Okay, but with the caveat that we don't believe that the Second Amendment proposed complaint is before the court, addressing your question, a couple things about the SNAP benefits. So first of all, just the plain allegation taken on its face. Someone leaves early in the month, and maybe their card is zeroed out, and so they don't really get the benefits until the end. Well, that is actually, as a matter of lived experience, something that people on SNAP benefits experience, whether you're in a rehab program or not. I mean, one may quibble with the sufficiency of SNAP benefits, but frequently they run out before the end of the month. But more importantly to this case, SNAP benefits running out, and you're leaving but not getting the next month's allotment until the next month, that's not a forced labor allegation. That may be, you took my SNAP benefits, but if you're leaving, you're obviously not being coerced to stay. And that's frankly why we think the Second Amendment complaint, even if you peek underneath the curtain to see what it says, doesn't cure this case. It's because that aspect of it, and there's other aspects of the Second Amendment complaint as well, which I know you may want to ask me about, but that particular aspect doesn't state a forced labor violation. In fact, anything that happens after you leave, it may be improper for other reasons, but it's not forced labor because you're no longer even in the institution. I think that's why the plaintiffs are drawing our attention to the idea of coercion, not forced labor. Now, on the Second Amendment complaint, what evidence do you see in the record before us that the district court looked at those, looked at the proposed Second Amendment complaint before denying leave to amend? I don't think the district court judge looked at the Second Amendment complaint. Okay. Now, how do you see that squaring with our admonition as a circuit about how to handle that situation? Yeah, so a couple things. Judge Blakey, as with any district court judge, is entitled to broad discretion to manage that court's docket, and this court has obviously reviews of denial under an abuse of discretion standard. The posture of this case was that they filed a complaint. Salvation Army filed a motion to dismiss. Then the plaintiffs took a look at that motion to dismiss and decided, without defending or opposing the motion to dismiss, to amend, and they did it in part, and they say this. This is not speculation. They say this. Judge Blakey has a standing order, and that standing order, which is part of the tools that he uses to manage his docket, says if you are faced with a motion to dismiss, take a good, hard look at it and decide do you want to defend or do you want to amend, and if you want to amend, amend, and so that's what they did the first time, and so they filed their first amended complaint. Then Salvation Army filed a second motion to dismiss because a lot of the allegations were the same and a lot that was in the second motion to dismiss was the same. Well, that same standing order was still out there, an order of the court, and they chose to defend at no point prior, and ultimately, obviously, because we're here, the judge granted the motion to dismiss and dismissed the case and closed the case, at no point, either in advance of opposing or as an alternative motion or as just an alternative argument within the opposition to our motion to dismiss, did it say that in the alternative, did they say in the alternative should the court see Is there anything in the civil rules that requires you to do what Judge Blakey's standing order requires you to do? There's nothing in the civil rules. I would suggest that district court judges, consistent with their discretion to manage large and many dockets, have to use those tools, and as you know, Your Honor, standing orders are a typical tool, whether it's for discovery purposes. I also know there's been a huge criticism of standing orders that don't comply with the civil rules, and that's what I'm just wondering about, the validity of that standing order. So, Your Honor, far be it from me to weigh in on that policy. I will say, however, that my friends for the plaintiffs have made no issue about that standing order. I understand. But where, for example, was plaintiffs' opportunity to cure defects that were really made known to them for the first time by the judge's ruling on the motion to dismiss? For example, your Rooker-Feldman argument, if I recall, was a footnote. It was something very small that you mentioned in passing during the motion to dismiss stage. That became a signature part of the judge's order. So where is plaintiffs' opportunity to amend in light of the judge's take on that? Well, I would suggest, and you're absolutely right, we raised it in a footnote, and the judge picked up on it and made it one of his bases for decision. It was a footnote, and just as the court picked up on it, plaintiffs could have picked up and said, dropped their own footnote and said, look, we see that there's a Rooker-Feldman argument made in a footnote. We don't think that's sort of fairly before the court or a meritorious defense. But to the extent the court thinks otherwise, we would appreciate an opportunity to address that. I'm just wondering, isn't that why we require district courts to review the sufficiency of a proposed amended complaint before ruling on the Rule 59 or 60 motion? Well, yes, when the circumstances warrant it. And here's the peculiar nature here. This court has said, and I think other courts align with it, this court has said that once a case is closed, dismissed, judgment is entered, that Rule 15 no longer is the operative rule. Rule 59E is the operative rule. And of course, that's a higher standard. And as this court said in Fanon, it's a tough road to hoe. Now, this court has also said, just to acknowledge that, this court has also said that when the court dismisses the case and grants judgment on the original complaint, that doesn't pass muster. And so even if it's technically a Rule 59 posture, we're going to apply the Rule 15 standard. But every single case they rely on, and we haven't found anything to the contrary because we all read the same cases, every single case they rely on where this court has reversed based on an abuse of discretion, it has been the original complaint. And so we are confronted here with, frankly, case law that tells district courts, you have wide discretion. Make sure you give them at least a second bite. But we have no case. You know, they cite the Dubitz case that even for Second Amendment complaints, leave should be liberally granted. But that was a Rule 15 standard. That case was still alive on other claims. The one thing that does strike me as quite different about the Second Amendment complaint than the first is that I don't have a hard time with the whole Rooker-Feldman thing to begin with. I don't see this as having anything to do with Rooker-Feldman at all. But if it does have something to do with Rooker-Feldman, that seems fixed by the Second Amendment complaint. So on Rooker-Feldman, and I see my time is running low. No, you can answer. Go ahead. Look, the First Amendment complaint spoke in several places, paragraph 3, paragraph 8, paragraph 145, about court orders and that probation or parole directed the folks there. It made the job for the district court judge a little tough. Now, that's weak. I think the plain, I mean, with all respect, though, the plain import, I mean, Ms. Bennett is right on this. The plain import of the complaint is about the way the program is being operated, about the way it's being administered, what's happening once you enter. And I don't think adjudicating those allegations would in any way result in review and rejection of state court sentencing orders or probation or parole orders. I just have a very hard time seeing that. May I respond with my final comment? Please, yeah. We absolutely do not need this court to affirm on Rooker-Feldman grounds. And it's not a hill that I or the Salvation Army is going to die on. For the reasons we state both in our motion to dismiss below, which is why we only put it in a footnote to begin with, and as we say in our brief, this case, put aside Rooker-Feldman, this case can be decided, the justice-referred plaintiff should be dismissed for the exact same reasons as the walk-in plaintiff. So I'm not going to defend Rooker-Feldman here as though it's necessary to affirm. I appreciate your candor. What you're saying is, look, the court would be, it's fair to view it as a pleading case, a sufficiency of pleading under the required elements of 1589A. Exactly. All right, thank you for your time. Anything else? Okay, very well. Mr. Wolf, thanks to you. Ms. Bennett? I just want to make three quick points on rebuttal. The first is, my colleague on the other side says that as long as it's a known condition of participating in the program, it's fine. That is not what the text of the TVPA says, and Judge Scudder, as you pointed out, that would cause quite a problem. That means that if you walked in and they said, well, we're going to beat you, or we're going to lock you in a room to force you to labor, that would still be fine because you knew going in. That can't be what the law is, and in fact, that was rejected in Reynolds. It was rejected by the Third Circuit in Burrell. What the law is, and this is the second point, is that if you use a threat of serious harm, and what that means is something that would compel someone under the circumstances to continue performing labor in order to avoid that harm, that is a TVPA violation. Here, the allegation was that the Salvation Army threatened to take away people's food and housing, that under these circumstances, these are people who were otherwise unhoused and starving on the streets, that they threatened to take that away. And the question is, would that compel a reasonable person under those circumstances to continue laboring? And again, the circumstances here, circumstances that the Salvation Army created, include not just targeting those people, but taking their benefits, meaning they couldn't go back out and use them to get food, taking their clothing, taking their prescribed medications, imposing a blackout period, prohibiting them from having other labor. So the Salvation Army created circumstances. Even just once you got there, after you go in, the Salvation Army creates circumstances under which, if you threaten someone in those circumstances to take away their food and housing, a reasonable person would stay. And I don't hear the Salvation Army saying that this case doesn't fall within the text of the statute. What I heard them say is, well, the TVPA must mean something different than its text. That's not how we interpret statutes. And again, that's an argument that the court in Burrell rejected. It's an argument that the court in Fagirigan rejected. The text of the TVPA is broad, and that's intentional. The whole point was to prohibit coercion that didn't necessarily rise to the level of involuntary servitude. And the last point, which I'll quickly make permitted, is I think underlying this, what the Salvation Army is saying is, look, this will threaten rehabilitation programs, work programs generally. This is just how it works. But if you look at, for example, the Fourth Circus decision in Armenda with the Salvation Army sites. Now, it's an FLSA case, but the point isn't the legal analysis. The point is to look at a program that legitimately is trying to get people on its feet. And that program is quite different. That program offers food and housing. But what it says, and it's trying to get people to learn how to be employed. And so it has an employment requirement. But you don't have to serve it working for the commercial enterprises of the program that runs it. You can have outside employment. If you are unable to work, they make an exception for you. If you're going to school, they make an exception for you. And they pay people minimum wage. And so they're not trying to keep people. They're not implementing practices that keep people working for the organization. They implement practices that ensure that people can leave. That's the opposite of what's alleged here. If there are no further questions. OK, Ms. Bennett, thanks to you, Mr. Wolfe. Thanks to you. The court will take the appeal under advisement.